Garland from Mr. Zaragoza. When the underlying Harris class was certified everyone understood the exact identity of who was in the class. The district court pointed to a list and said these workers are in the class and are class members. It also specifically identified 44 declarants, recognized they were class members, and said they had all experienced the discrimination as Mr. Zaragoza's name is on the list and he had the exact same experience as a number of those declarants. So he was in the class. And Union Pacific explicitly confirmed this understanding to the 8th Circuit. So everyone agreed. The class included workers who had a health condition that, when Union Pacific became aware of it, triggered a fitness for duty exam. And that's all that's needed to resolve this case. American-type tolling ensures the efficiency and economy of Rule 23 and that it provides that by preserving the rights of absent class members so that they don't file premature and duplicative claims. So when the district court and both parties to a class action all agree that a certain group of absent class members are included within the class, those absent class members are entitled to rely on that fact for tolling purposes. What's our touchstone? Is it when the plaintiffs put together their complaint and allege the class or is it when the court actually certifies the class or is it when the plaintiffs moves to certify a class? It's when the court certifies a class and if there's a change in a class definition when the court changes that order, certifying a class, and if change is a definition, there would be a no change in the actual definition of the class. So there's no reason for absent class members to think that they would not be in a class anymore. So when the plaintiffs file their complaint, an absent class member, arguably covered, would fall under American-type and receive the benefit of tolling. Yes. So when the district court certifies a narrower class, absent class members may or may not fall out of that definition, but at that point tolling would cease, correct? I think the standard is whether it was reasonable for that absent class member to rely on the class representatives to continue to protect their interest after the court had certified the class. And in the wake of American-type tolling, lower courts have coalesced around an approach that focuses on an absent class member and what they would have reasonably understood. For example . . . But I mean, if the class certified by the district court is narrower, we're traveling under that definition at that point forward. Yes, Your Honor. For example, this court in Hall in 2013 explained American-type tolling ceased. They are because, quote, a few of the class members had no reason to And I think that in a Fourth Circuit case called Bridges, Judge Niemeyer coined a helpful phrase to describe the standard. He called this the reasonable class member rationale. And under that standard, the key inquiry is what, if you were in the shoes of that absent class member, would you have reasonably understood? If it was reasonable to continue to rely? And in the cases, my friends on the other side sites, Smith and Sawtelle, indicate that to make that determination, you first look to what the district court said in its certification order. And courts also look to what the named class representatives asserted who is in the class. But here, Your Honor, all we need to do is look at what the district court said in its certification order. Here is objectively reasonable for someone in Mr. Zaragoza's shoes to think based on what the district court said that he was in the class. That's because. You mean when he was on the list that was purportedly going to get notice of the class? Yes. And it's not just that, Your Honor. The district court said it was certifying the class list of over 7,000 employees that Union Pacific had provided. It also referred to these employees as the class members. And it specifically recognized the experienced 44 declarants. And it stated that those declarants had experienced discrimination alleged by the complaint. And a number of those declarants had the exact same experience as Mr. Zaragoza. But what do you make then of what the district court in this case did? It seemed to draw a distinction between a reportable health event and the fact that Mr. Zaragoza did not have a reportable health event. I mean it's interesting, is it not, or maybe it's not, that Union Pacific defined that term. In other words, the employee-employee-employee relationship, part of that was that this was a defined term when you had a reportable health event versus a periodic screening. Yes, Your Honor. When the district court certified the class, it explained that those 7,000 individuals had a reportable health event. It didn't define a reportable health event in any specific hidden way. Well, but Union Pacific defines it in its employment documents. In other words, again, Mr. Zaragoza was employed by the railroad under the terms and conditions that the parties would have had. And that means a reportable health event would have had the definition that Union Pacific gave it, correct? And I think he did have a reportable health event based on Union Pacific's understanding. That's because he had a health condition. When Union Pacific became aware of it, it triggered a fitness for duty evaluation. A part of it here was he failed the colorblindness, the initial exam, but it was part of a periodic screening that occurred every year, two years, whenever it was. In other words, he was going to have to go through the certification or recertification regardless. Yes, Your Honor. He went through the Ishihara test. He failed that test, and that failure is what triggered the fitness for duty exam. But that wasn't a reportable health event, though. Well, it was, Your Honor, and that's because, as Union Pacific recognizes, reportable health events include recent events specifically can include failed Ishihara tests. And that's what happened here. Before he failed that test, Union Pacific permitted him to perform a state's B-sensitive role. After he failed that test, Union Pacific changed its mind. It suspended him from service without pay, and it put him through a fitness for duty examination. So that event, that failure of the Ishihara test, was a reportable health event. And that's also how Union Pacific itself understood the term reportable health event. And I can explain that based on the evolving class definition itself. Originally, Union Pacific told the class representatives that the original definition was going to include hundreds of thousands of employees and be far too broad. So it insisted that the class representatives narrow that original definition to tie a reportable health event to a fitness for duty event. And that's what the class did based on Union Pacific's insistence. Indeed, in letters and in interrogatories, Union Pacific specifically stated that this list it was producing that eventually included over 7,000 individuals was covered by a definition that tied those two things together, specifically covered by a definition of a reportable health event that a duty for fitness evaluation that was initiated because of a reportable health event. And that's in the letter that we cite in our brief. And so it was clear that everyone understood throughout the entire Harris class litigation that those on the list were covered by this narrow definition. Indeed, and moving for class certification, the class representatives explicitly stated to the court that it was moving for this narrow definition because I quote, it matched the definition that Union Pacific said covered those on the list. So it was apparent to 7000 plus the 7000 plus. Yes, Your Honor. But although it is clear he fits the definition, I don't even think that the court needs to reach that question because the question here is not what a post hoc parsing of definition means. Rather, the question is whether it was objectively reasonable for someone in Mr Zaragoza's position to rely on the class action to protect his interests. And because the district court doesn't doesn't that require a parsing also? Well, I think it requires looking at what the district court said at class certification, and it said he's in that class. So for someone in Mr Zaragoza's shoes to be told by the district court that they're in the class, that their name is on a class list, that those who have the exact same experience as him are example class members, it's reasonable for him to then someone in his shoes could then think he also would be part of the class. And to the contrary, under Union Pacific's rule, that would mean a class member would have to disagree with what a district court told him. A parse the definition in a way no one during the Harris litigation understood. And indeed, contradict what Union Pacific itself told the Eighth Circuit. Um, and that is just not reasonable. Indeed, to the Eighth Circuit, Union Pacific confirmed the same understanding that the district court had. It explicitly told the Eighth Circuit that the class was too broad because included these more than 7000 current and former employees. It also pointed to two declarants. Mr Donahue and Mr Barkmire had the exact same experience that Mr Zaragoza had, and Union Pacific told the Eighth Circuit it's because people like these individuals are in the class. The class is too broad and was improperly certified. And Union Pacific today takes an opposing position from what it said to the Eighth Circuit. I know it also is contradicting itself in recent cases, in the Ninth and Eighth Circuit on similar American pipe tolling cases with similarly situated individuals. But Union Pacific's rule does not ensure that the aims of American pipe tolling are vindicated. Rather, the goal of American pipe tolling is to ensure the efficiency and economy of Rule 23. And American pipe at the court, American pipe court itself explained that a rule requiring this successful anticipation of the determination of the viability of a class in order to preserve an individual class individual class member's rights would proceed would breed needless duplication of motions. The court specifically noted that so because there are subtle factors, including with a similar litigation history in the court's docket that could help inform someone whether or not they're part of the class. But if you're left to parse those types of subtle factors to guess whether or not you're in a class, plaintiffs and their counsel are going to encourage protective motions being filed. And that would undermine the efficiencies of the class action rule is meant to provide. And I think the same thing would happen if post hoc defense counsel is able to parse the definition in a way no one understood at the time to exclude members of the class and take away their rights. Because if that's allowed, then counsel and plaintiffs would try to file the very types of perfect protective motions anytime there could possibly be any other ambiguity determined post hoc. And that would create again, the very types of inefficiencies the Rule 23 was specifically supposed to prevent. Finally, I note that it's no he he if the class was not to certified what what then we'd have duplicative actions and all the things you're talking about would would result from Union Pacific's position. Your Honor, after the Eighth Circuit oral argument, counsel read the team needs could see what was happening. And because they had so many individuals, they had to file claims were given at the short period they had that started to prepare the filings shortly before the class was actually certified. That's correct, Your Honor. But I think that's different from what it was. The rule you Pacific's asking for Union Pacific's asking for a rule that would encourage class members and absent class members to file many of the many filings in order at the very beginning of the class, for example, to ensure that their rights are protected. But in Crown Court, the Supreme Court stated that Rule 23 is not just to allow absent class members to assume that their rights are being protected by the class. Rather, it is encouraging them to do so precisely in order to preserve the efficiencies. And so it's also, you know, it's no accident that Mr Zaragoza's name was on that list or that he was included in the class. He's one of very many individuals who had the same experience that he had, including the class declarants. And no one throughout the entirety of that litigation ever indicated that someone like him was not part of the class. To the contrary, everyone understood he and those like him were in the class. Thank you, Your Honor. Scarlett, thank you very much. We'll see you back on rebuttal. Mr Moore. Thank you, Your Honor. Do you have everything you need? I do. Thank you very much. Very accommodating. Take your time. Good morning, Your Honors. May it please the court. My name is Scott Moore, and I represent the Applee Union Pacific Railroad Company. The District Court correctly granted summary judgment because Mr Zaragoza's testimony was untimely, and the District Court accurately concluded that the American pipe and its progeny carve out for tolling for class actions did not apply. I think it's very important first to understand a few things factually. There was never a class list sent out in this case. After the District Court's opinion, the case was interlocutorily appealed to the Ace Circuit, that supposed class list was never sent out. There was no notice given. Throughout discovery, Union Pacific made very clear to the plaintiffs in the Harris class action that that list was over-inclusive. And court after court has admonished, quite frankly, counsel in calling it a class list. It was never a class list. Thirdly, neither the Ace Circuit nor the District Court made any decision as to who on that list or who else was in the class. And the District Court expressly addressed this in the opinion of the District Court saying that there were some fleeting mentions of this list and other things within the District Court's opinion, but the Court didn't address who was in the class or who was not in the class. But the Court called them class members. In passing, called class members, but made very clear in the District Court order itself, there was no determination of whether they may be. In other words, this would be a list of people who would get notice who may be in the class. There was no determination by the District Court that these were actual class members. There were, again, fleeting references to that, but we don't . . . The District Court here emphasized that point, that maybe somebody like Mr. Zaragoza would have gotten this class definition and known he was excluded. That to me seems to be a very weak point in the District Court's analysis because how are we going to put the onus on Mr. Zaragoza to get that class when he's getting the notice of this class action? I mean, assuming notice went out, obviously, and thereby know, oh, I'm not included because I didn't have a reportable health event. Maybe that's a different case if the notice did go out, but it didn't. The Court stayed . . . But we're also, we're sort of, I guess reading tea leaves is maybe a theme. We're looking at what the District Court in Nebraska said and parsing what the District Court there said. I mean, again, what's the District Court here supposed to do other than look at that? I get that, but he's calling them class members. There are these affidavits. There are these affidavits from plaintiffs who are in the exact same position as Mr. Zaragoza. I mean, doesn't that cut against you? So, I'll say that we don't need to get there, Your Honor, because the class definition that was proposed by the plaintiffs in the Harris case was the And if we're looking for a rule that we can rely on here and following American Pipe, Crown Cork, and its progeny, the question is, very clearly, if someone was a member of that class, had that class been certified and went forward, they would have been participated, then they are in . . . that is told. And it wasn't told because of notice to particular individuals who may or may not be out of the class. It was strictly to serve the purposes of Rule 23, which was to prevent interventions, unnecessary interventions, and then in Crown Cork, prevent unnecessary complaints being filed afterwards. That's an excellent point. In fact . . . And it basically relies on the idea that the defendants have notice of who's suing the defendants and on what claims they're arresting their case. I mean, So, simple question. This Ishihara test, the initial colorblindness test, if an employee failed that test, as counsel opposite, I think, said, did that give rise to a reportable health event or was it such that he would be covered? Sure. Absolutely not. And the reportable health events, Judge Wilson, as you mentioned, is a term of art that was defined by the Union Pacific Medical Rules of which all employees have . . . this is not a hidden policy. This is a They need to understand the medical rules. Under those medical rules, there is a fitness for duty program. And I cite the court to, in the record, apps 731 through 739. These medical rules were attached to the complaint and when the class was narrowed by the motion, was submitted to the court as the seminal definition of what a reportable health event is because it was evaluation. In that, in those rules that are attached to the complaint, there are different categories of how a fitness for duty evaluation arises. Reportable health events is its own section. Regulatory exams, including FRA exams, which this was, is an entirely different section from the reportable health event. A recertification. That's correct. Every employee that was in the covered category had to pass it. That's absolutely correct, Your Honor. In fact, Mr. Zaragoza had already failed the test twice. He missed every single plate on the Ishihara test. So when you look at a reportable health event definition, the definition is, employees must report the following reportable health events. And it says, significant vision or hearing changes. So when, when the class was narrowed only to reportable health events, in that particular scenario, the new diagnosis, recent event, or change in a prior stable condition for significant vision changes. There was no vision change here. In fact, if you look at the reportable part, there's a reason reportable is in there. People have health conditions of which the railroad would not be aware. They may be hired on and be fined and have a stroke, for example, and that stroke needed to be reported, because that could affect their ability to safely do the job. And Union Pacific doesn't have the right under the ADA to ask medical questions routinely. The FRA doesn't regulate that, so they can't ask that. But for vision changes, tri-annually, every person who operates in a locomotive must go through the vision test and take the Ishihara test . . . Back on, back on the, the class definition. Yes, Your Honor. How much weight should we give the fact that the district court that oversaw the Harris class action thought Zaragoza was a member, was within the class? Why shouldn't we rely on that? Why do we have to make our own independent inquiry whether he falls into that definition or not? Well, first of all, we don't agree that the record supports that conclusion. Again, the supposed class list, the court never, never made any determination or addressed whether all of those individuals were in the class. They said notice would go out to the, and they, to notify them that they may be in the class. Never did the district court or the Eighth Circuit ever decide who was in the class or not. The record simply doesn't support that. It's very clearly on the face of the complaint. And the district . . . Did Union Pacific take the position before the Eighth Circuit that, that Mr. Zaragoza were, were in the class and that was evidence that the class was too broadly defined? So Union Pacific included in a sentence saying that the, the list of, on that list included people with neurological disorders, cardiac disorders, vision changes, and that usurped the, the, the declarations that were, were submitted by the plaintiff. Union Pacific didn't submit those, those declarations. And that was reviewed not for whether they were included in the class or not. If you look at the district court's opinion in, in this case, it pointed out that the district court in Harris looked at those, those, those declarations for adequacy of representation and conflicts of interest, which didn't make a determination of whether they were covered or not, but just it, was this firm adequate to represent the class and were there any conflicts of interest? So, but, so Union Pacific goes up to the Eighth Circuit and says the class is too broad because it includes too many people, too many people that shouldn't be covered. I mean, if you're arguing that, that these kinds of plaintiffs, plaintiffs with vision loss or colorblindness are in the class improperly, how is that not evidence that the parties believed that they were within the class as certified? Well, first I'll say that, first of all, that's a judicial estoppel argument. That is not before this court. It was argued before the district court, but it was abandoned on appeal. If they believe that Union Pacific took . . . Well, I'm not, I'm not talking about, I'm not trying to estop you, I'm just trying to figure out what the party's views were at the time and per Judge Willett's questions, how much are we supposed to parse here and why wouldn't we just look at what the district court did when the class was certified and if he was considered to be under the definition, he would be within the class still? And I think we should do that, Your Honor, because the district court adopted the exact definition that the plaintiffs provided. And to say that Union Pacific is inconsistent, I think it's very important to know that the plaintiff's memo in support of class certification, the first line stated, plaintiffs challenged Union Pacific's policy of removing employees from their jobs based upon an arbitrary and scientifically unsound 1% rule regarding the risk of sudden incapacitation. And that's in the record at 1069. They narrowed the class because they weren't challenging the regulatory exams, they were challenging a 1% risk of sudden incapacitation. When Union Pacific mentioned that their proposed original class would be over 100,000 employees, it was because it was so broad that it included regulatory exams, because every train service employee has to go through regulatory exams. We're talking about tens of thousands of people that go through those regulatory exams. So they narrowed it, and they said, under Union Pacific's reportable events policy, employees in safety-sensitive positions are required to disclose certain medical conditions, turn over their medical records, and submit to fitness for duty evaluations. That was their opening paragraph in their motion for class certification. Mr. Zaragoza didn't report anything. Mr. Zaragoza was not asked to turn over medical records. Mr. Zaragoza was not subjected to a separate fitness for duty evaluation. He went through the Federal Railroad Administration regulatory exam here, and nothing more. The American Pipe Rule says that all asserted members of the class have their statute of limitations told. It doesn't say proven members of the class, or verified members of the class, or confirmed members of the class, but all asserted members of the class. So how should we understand the word asserted? Well, actually the American Pipe and Crown Court held that all members of a class who would have been parties, had the suit been permitted to continue as a class action, are told. So we do have to determine if the person would have been a member of the class. Not asserted. They talk about notice to the employee, but I think the Supreme Court said we think no different standard should apply to those members of the class who did not rely upon the commencement of the class action, or who were not even aware of the class action. And if you look at footnote 21, only seven of the 60 intervenors in American Pipe were even aware of the class action. American Pipe was not decided because of notice to someone. It was decided because, as an administrative matter for Rule 23, to ensure that a class action dealt with the whole class. It's a fiction to say that an employee is going to be checking PACER to determine what a district court said, or what a district court didn't say. These people were aware of their claim at the time they were withheld from service. They knew they had a claim, and their claim began to, the statute of limitations began to run then. To say that somehow Mr. Zaragoza was checking PACER and looking at orders of the district court is a fiction, and that doesn't give us any direction. Because what it's going to cause is plaintiff's counsel to file these enormous class actions, right? Enormous class actions of every single employee, even though they know they're not going to be in the class action, only to narrow it later and say, well, this poor employee thought they could have been included in that. How are they supposed to parse this out? What they're doing here is parsing out a clear definition. Reportable health events is very clearly defined. They narrowed it to reportable health events, which requires a significant vision change. Mr. Zaragoza did not have a significant vision change. That's very aware. He had failed the Ishihara twice before. His color vision was set. In fact, he admitted he had a color vision deficiency when he applied for the case in the initial application here. The fact that . . . Again, Mr. Zaragoza didn't rely on it anyway. He filed his charge before the Eighth Circuit even issued its opinion in this case. To say that Mr. Zaragoza was at a disadvantage because he didn't know, like any other employee, he wouldn't be looking at that. We believe . . . But he kind of was. I mean, his lawyers knew, as counsel opposite represented, enough to know that the oral arguments before the Eighth Circuit suggested he might go ahead and file. I mean, that's probably a plaintiff that's paying more attention than maybe the average . . . Well, he was represented by the same lawyers who were representing the plaintiffs in the class action. Well, I understand, but my point is that he was sort of monitoring through his lawyers what was going on here. I mean, the balance to me, I mean, either each side's point of view, but Union Pacific's point of view is going to lead to myriad belt and suspenders cases being filed by individuals who are probably in part of classes or may not be, or they're going to insure against being thrown out of court if they determine not to be part of the class later on down the road. I mean, that seems inconsistent with American pipe. We believe the opposite, Your Honor, that we have to rely on what the class definition is. The class definition is very clear. To go back and try to pick apart what was said in discovery and those issues, it actually creates a rule that the court will face these massive class actions and with somebody coming back and saying, well, I didn't really understand that, even though I wasn't in the class action. It's a subjective, rather than an objective standard, it becomes a subjective standard from the point of view of the employee. And there are, there is pressures to Union Pacific here, because now we're talking about claims that go back to 2015 and 2016. And back pay continues to, back pay continues to accrue. So instead of dealing it within the 300 days when someone files it, now we're dealing with five, six, nine years of back pay that it wouldn't have to had they been timely filed. But we see very clear here that American Pipe said that if you are in the defined class and the class was very clear, there's no need to look at all these other, these rabbit holes they try to create here, when the definition is very clear. If you had a reportable health event and your FF, your fitness for duty flowed from that, then you're in the class. A reportable health event requires a significant vision change. On the face of that definition, that's objective and easily understandable. Very clearly there. In my remaining moments, Your Honors, I would like to talk about the fact that there are alternative grounds to grant summary judgment here. This court in Williams v. J.B. Hunt Transport Incorporated, 826 Fed Third 806, held on alternative grounds in a very similar case that employee was not qualified under the ADA because he wasn't certified by the Department of Transportation under the FMCSA federal safety regulations. In this particular case, Mr. Zaragoza failed a federal railroad administration regulatory exam. He needed to pass that exam in order to have a license to operate a locomotive. He did not have that because he failed this exam. Upon failing that exam, there is a robust appellate process through the FRA that someone may appeal, a conductor or an engineer, if they fail that test and appeal their certification. There are multiple levels of administrative appeal and if they're not happy, then it would come before the Fifth Circuit in the same manner. Because he lacks that certification, he is a not a qualified person with a disability because he can't establish the basic requirements for the position. We argued this in our brief and we argued this before the district court and this is an alternative grounds. In Williams v. J.B. Hunt, this court said the exact same thing. There, the employer was hiring drivers, commercial drivers. This commercial driver had a health event and one doctor said that he was fit under the FMCSA regulations to drive a truck. The employer's doctor said he wasn't. The employer followed its own The FMCSA regulations allow him to appeal that. He didn't appeal that. Instead, he brought an ADA claim and said, you are discriminating against me on the basis of disability. This court indicated that he could not maintain a claim under the ADA unless and until he appealed with the safety regulations with the designated Congressional Safety Agency. In that particular instance, if he appealed and the Department of Transportation said he should have got his certification, then we can decide if the employer is discriminating against this individual. But as the Supreme Court said in Albertson's, the same principle that if an employer is following a federal safety regulation, Congress recognized that even if that's inconsistent with the ADA, that it has the right to follow that and doesn't have to defend that federal safety regulations to prove that it didn't violate the ADA. And it's very clear here that Mr. Zaragoza had that that that robust appeal to take to the to the the Federal Railroad Administration that he admittedly didn't do so. And by not doing so, he was not qualified in the first place. And understand, this is a result of the Goodwill train accident outside of Oklahoma in 2012, where because of a person's lack of color vision, three individuals died. Three Union Pacific employees died. And the NTSB had Union Pacific incorporate a different color vision field test to prevent that from happening again. That's what Union Pacific is defending in this case, Your Honor. Thank you. Thank you, Mr. Moore. Ms. Garland, you're back on rebuttal with the final five minutes of the week. Thank you. Just a few points, Your Honor. First, I'd like to note that there's no unfair prejudice to Union Pacific. They had more than adequate notice of who was in the class. Indeed, they produced the class list that the District Court said was the class list. And it also was not, they never argued it was an over-inclusive class list after the court certified that list to the District Court. Before the court certified the list, they specified three individuals with muscular disabilities may or should not have been on the list. They never said anything about anyone with a vision issue, that those individuals were inappropriately included on the class list. Indeed, the District Court made a specific determination that those with the exact same experience as Mr. Zaragoza was in the class. It wasn't just a passing reference when it made this inadequacy representation determination, the District Court had to ensure that these declarants were plaintiffs and that their interests matched with the class representative. So it was, in fact, a key to the holding of the District Court certification decision. The court also specifically stated on page 624 that those on the class list had a reportable health event. So based on the definition, the District Court certified Mr. Zaragoza and those like him were on the class list. Finally, I note that Union Pacific's rule of who had a reportable health event cannot be because then the named plaintiff, Mr. Harris himself, wouldn't have qualified. He did not have any change. He had a long-standing epilepsy diagnosis that he redisclosed to Union Pacific and it was just that redisclosure that led to his fitness for duty evaluation. So no one . . . The disclosure is pretty important because that fits within the railroad's definition of reportable health event. Mr. Zaragoza didn't report anything. When he failed the Ishihara test, and that failure was reported, and then based on that . . . Did he report it, though? In other words, he didn't report anything that set into motion his testing. It was a regulatory testing. And the results of that were reported to Union Pacific, and Union Pacific has recognized itself a reportable health event. Surely it can be, but in this case where it was sort of a repeated occurrence before and after, it doesn't seem to fit within the definition of what a reportable health event is. Well, there's nothing in the rules that say that it's that individual that has to make the reporting rather than the tester making the reporting, for example. The rules, you mean the Union Pacific . . . The Union Pacific rules. Union Pacific also recognized, for example, a that would count as a reportable health event. Doesn't that sweep in all the people that were excluded in the narrowed definition of the class the plaintiffs proposed? No, Your Honor. I think that there are duty for fitness evaluations that happen cyclically on a regularly scheduled time. But every time somebody failed one of those, it would be reported for follow-up. Well, here the duty for fitness evaluation is the light cannon test. It's the second test that he took. So, if he hadn't had a reportable health event, he hadn't failed that Ishihara test, he wouldn't have had the light cannon test. He wouldn't have been sent . . . And everybody who fails the Ishihara test on a regulatory screening is then going to have a reportable health event because . . . And so, in other words, they're going to be swept back into the class even though they were ostensibly excluded. I don't believe that it's those vision plaintiffs that were intended to be excluded. This class covered people with all different types of disabilities. Again, for example, Mr. Harris himself had epilepsy. Others had strokes. And so, it wasn't just focused on vision plaintiffs. I believe there were about 90 vision plaintiffs who were in the class, but it wouldn't have overextended back to the original class definition. Thank you, Your Honor. Anything else? Okay. Thank you so much. We appreciate the able arguments today. And the case is submitted. All right. That wraps up everything for the week. So, the court will stand adjourned.